**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v. )<br>)<br>CHARLES WILLYS MINCEY, JR., )<br>)<br>)<br>)<br>) | CR: 2:21-cr-00788<br><br>DEFENDANT'S MOTION FOR<br>VARIANCE FROM THE<br>SENTENCING GUIDELINES |

The Defendant, Charles Willys Mincey, Jr. ("Mr. Mincey" or "Defendant" or "Chuck Mincey"), by and through his undersigned counsel, E. Bart Daniel, respectfully submits this motion for variance from the United States Sentencing Guidelines ("Guidelines" or "USSG"), pursuant to 18 U.S.C. § 3553; United States v. Booker, 533 U.S. 220 (2005); United States v. Koon, 518 U.S. 81 (1996); United States v. Gall, 552 U.S. 38 (2007); and Rita v. United States, 551 U.S. 338 (2007). Chuck Mincey asks the Court to sentence him to a term of Supervised Release or a combination of Home Confinement and any additional conditions the Court deems appropriate. As discussed below, such a sentence is adequate but not greater than necessary to satisfy the ends of justice and is permissible under 18 U.S.C. § 3553.

## I. INTRODUCTION

This motion is respectfully submitted in support of a variance from the advisory Guidelines set forth in the Presentence Report ("PSR"). It is also provided as a sentencing memorandum to assist the Court by providing additional information relevant to Mr. Mincey.

The Guidelines, as set forth in the PSR, provide a range of punishment of 18 months to 24 months of imprisonment, along with a fine range from seven thousand five hundred ($7,500.00) to seventy-five thousand ($75,000.00) dollars, a range of one to three years of supervised release

and a $100.00 special assessment.[1] *See* PSR § D.76-78; 87-89. Pursuant to 18 U.S.C. § 3553(a), and as set forth more fully below, the Court should vary downward from the advisory Guideline range because Mr. Mincey has no criminal history and otherwise has proven to be a generous, hard-working, trustworthy member of his community as well as a superb husband, son-in-law, friend, mentor, and role model who exemplifies the values of integrity and selflessness, as demonstrated in his letters of support and the numerous references from non-profit organizations and homeowners who worked with him. Despite his own health conditions, Mr. Mincey is an integral part of his family upon whom many depend for daily support. Allowing Mr. Mincey to serve a term of supervised release will lessen the likelihood of further suffering by his family members and the detrimental impact it will have on his wife and mother-in-law should he not be present to help with their physical needs.

## II.    SENTENCING LAW AND PROCEDURE

The Guidelines are now but one of seven statutory factors to weigh when formulating a sentence. *United States v. Booker*, 543 U.S. 220 (2005); 18 U.S.C. § 3553. In *Booker*, the Supreme Court held the mandatory manner in which the Guidelines required courts to impose sentencing enhancements based on facts found by the court, and by a preponderance of the evidence, was a violation of the Sixth Amendment to the Constitution. The Supreme Court severed two statutory provisions, 18 U.S.C. § 3553(b)(1) (requiring sentencing courts to impose a sentence within the applicable Guideline range) and 18 U.S.C. § 3742(e) (setting forth appellate standards of review for sentencing issues), thereby making the Guidelines advisory. *Booker*, 543 U.S. at 243-44 (citing *Blakely v. Washington*, 542 U.S. 296, 313 (2004)). Although the Guidelines are no longer

---

[1] Mr. Mincey attempted to pay the special assessment of $100.00; however, the check was returned to him via letter dated November 22, 2021 because the Court was unable to determine the case number to which to apply his funds. *See Exhibit A*, November 22, 2021 Letter from the Deputy Clerk of the United States District Court for the District of South Carolina.

2

mandatory, *Booker* makes clear that a sentencing court must still "consult [the] Guidelines and take them into account when sentencing." *Booker*, 543 U.S. at 224.

In *Gall*, the Supreme Court articulated the procedure that must be followed:

> As we explained in *Rita*, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree to the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

*Gall*, 552 U.S. at 49-50 (internal citations omitted).

Following *Booker*, and by extension *Gall* and *Rita*, the Fourth Circuit has held that a district court should first determine the appropriate sentencing range under the Guidelines, making all factual findings appropriate for that determination. *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Next, the court must "determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Moreland*, 437 F.3d 424 (4th Cir. 2006) (quoting *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)). The inquiry under § 3553(a) is broad-ranging. As the Fourth Circuit has observed, there is "essentially no limit on the number of potential factors that may warrant . . . a variance." *United States v. Davenport*, 445 F.3d 366, 371 (4th Cir. 2006).

3

"Generally, if the reasons justifying the variance are tied to § 3553(a) and are plausible, the sentence will be deemed reasonable." *United States v. McClung*, 483 F.3d 273, 277 (4th Cir. 2006) (quoting *United States v. Moreland*, 437 F.3d 424, 433 (4th Cir. 2006)). If the Court imposes a sentence outside the Guidelines range, it should explain its reasons for doing so. 18 U.S.C. § 3553(c)(2); *see also Hughes*, 401 F.3d at 546.

In sum, the Court must first establish the sentence under the Guidelines. Second, the Court must allow the parties to argue for the sentence they deem appropriate. Third, the Court must consider all of the factors set forth in 18 U.S.C. § 3553(a) and decide an appropriate sentence and adequately explain the chosen sentence.

### III.     A VARIANCE IS WARRANTED UNDER 18 U.S.C. §3553

A variance is warranted under *Booker, Gall*, and 18 U.S.C. § 3553. Title 18, U.S.C. § 3553 provides:

> (a) **Factors to be considered in imposing a sentence.** The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>
>    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>    (2) the need for the sentence imposed—
>       (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>       (B) to afford adequate deterrence to criminal conduct;
>       (C) to protect the public from further crimes of the defendant; and
>       (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>    (3) the kinds of sentences available;
>    (4) the kinds of sentence and the sentencing range established for--
>       (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
>          (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made

4

to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement--

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(a). These factors are analyzed and applied to this case as follows.

### A. Nature and Circumstances of the Offense

Under the first factor of Section 3553(a), the Court should consider the nature and circumstances of the offense. The charges brought against Mr. Mincey—for which he has pleaded guilty and accepts full responsibility—are based on his involvement in the submission of inaccurate statements on housing loan certification forms which were submitted to the Federal Home Loan Bank of Atlanta ("FHLBA") and other banks in connection with loan applications. The FHLBA disburses some of its Affordable Housing Program (AHP) funds through the non-competitive Energy Efficiency/Weatherization Rehabilitation Product (EWP) and the non-competitive Veterans Rehabilitation Product (VRP).

As part of the program, the community member bank, intermediary, contractor, and inspector were required to submit certifications related to estimated construction costs and actual costs once the work was completed. The certifications contained inaccurate statements related to the funding statements and certification applications, and incorrectly stated that there was no conflict of interest with any party associated with the applications. While Mr. Mincey did not personally submit those certifications to the bank, he takes full responsibility for his involvement in this crime and recognizes that his involvement in an improper confidential agreement with Karl Zerbst to share half of his profits with Mr. Zerbst, the Fiscal Intermediary, was a conflict of interest. Although his actions represent serious errors in judgment and a violation of 18 U.S.C. § 371, these acts were non-violent and were limited in their consequences, and as discussed below, are not representative of Mr. Mincey's true character.

Thus, the nature and circumstances of the offense weigh in favor of a variance downward from the advisory Guideline range.

### B. History and Characteristics of the Defendant

Under the first factor of Section 3553(a), the Court should also consider the history and characteristics of the Defendant.

Mr. Mincey is 65 years old and is in relatively poor health. He is currently being treated for coronary heart disease, atrial fibrillation, and prostate complications, as well as an ongoing period of illness with pneumonia.[2] Mr. Mincey suffered from a heart attack in 2019 and underwent

---

[2] *See Exhibit B, "Medical Conditions Southern MS Heart Center Sep 9 2020 corsp"* containing a "problem list" which includes Essential (primary) hypertension, Atherosclerotic Heart Disease of Native Coronary Artery Without Angina Pectoris, and Paroxysmal Atrial Fibrillation*; Exhibit C, "Medical Conditions ECG Heart Attack001"* containing ECG details for tests conducted on July 5, 2019, July 9, 2019, and August 28, 2021; *Exhibit D, "Medical Conditions NT Probnp001"* containing high test results for an NT-pro-BNP test conducted on July 5, 2019; *Exhibit E, "Medical Conditions NUCLEAR Stress Test"* which notes finding of "imaging demonstrates inferior apical defect on stress" for test conducted on July 10, 2019; and *Exhibit F, "Medical Conditions PSA Diagnostic001"* noting "Flag H" for PSA value of 8.2 ng/ml on test conducted on October 4, 2021, which is over 2x the Standard Range of 0.0-4.0ng/ml.

6

heart catherization.  Mr. Mincey's daughter, Annah, passed away unexpectedly in 2021, and he has endured recurring episodes of atrial fibrillation since her death.[3]  Accordingly, Mr. Mincey has regular follow-up visits with his cardiologist to monitor his status.[4]  Mr. Mincey is scheduled for a second heart cardioversion in the next few months due to his atrial fibrillation and chronic heart disease, and, if unsuccessful, a pacemaker may be required.  In addition, Mr. Mincey is also recovering from double pneumonia which was diagnosed as suspicious for Covid-19 pneumonia.[5]  Accordingly, Mr. Mincey would benefit from a sentence of a term of Supervised Release or a combination of Home Confinement and Supervised Release to lessen the likelihood of further health complications.  In addition, allowing Mr. Mincey to serve a sentence at home is consistent with the Attorney General's directive to prioritize home confinement as an appropriate response to the Covid-19 pandemic, especially here, where Mr. Mincey may be vulnerable to additional health problems related to Covid-19.[6]

More importantly, due to her glaucoma and significant vision loss, Mr. Mincey's wife, Susan Mincey, fully relies upon Mr. Mincey to drive her at night and in the case of bad weather given that they live in a small town with inadequate public transportation.  *See Exhibit K,* Letter

---

[3] *See Exhibit G,* "*Southern Mississippi Heart Center August 8 2021*" noting Mr. Mincey's current diagnoses of Paroxysmal Atrial Fibrillation, Atherosclerotic Heart Disease of Native Coronary Artery Without Angina Pectoris, and Essential (Primary) Hypertension and stating "He is going through profound stress, as his youngest daughter has passed away.  He complains of chest tightness/discomfort…EKG in office today: rapid atrial fibrillation"; and *Exhibit H,* "*Medical Conditions ER Visit August 28 2021*" which includes diagnosis of "Atrial fibrillation (irregular heartbeat)".

[4] *See Exhibit I,* "*Southern MS Heart Center Office Visit Oct 13 2021001*" (appointment details and noting return visit in four months).

[5] A January 12, 2022 PA and Lateral Chest X-ray Report by Dr. Lane Rushing, M.D. notes "Widespread bilateral predominantly peripheral infiltrates are present in the pattern suspicious for Covid 19 pneumonia." *See Exhibit J,* "*Chuck Mincey chest xray 1-12-22".*

[6] *See* Federal Bureau of Prisons "Frequently Asked Questions regarding potential inmate home confinement in response to the COVID-19 pandemic" *available at* https://www.bop.gov/coronavirus/faq.jsp (last visited Apr. 6, 2022); *see also* Attorney General Barr's April 3, 2020 Memorandum for Director of Bureau of Prisons *available at* https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf (last visited Apr. 6, 2022).

from Susan Mincey. Mrs. Mincey states that Chuck "is extremely needed at home…without him it will be very difficult", including "on a daily basis." *Id.* Further, Susan Mincey is the primary caretaker for her 83-year-old mother who is prone to falling, and Mr. Mincey's assistance is crucial to Susan Mincey's ability to make and keep medical appointments for herself and her mother, as well as to aid with his mother-in-law's very limited mobility. *Id.*

The numerous letters of support submitted to the Court on behalf of Chuck Mincey describe a father, professional, friend, and partner who, aside from this offense, has led a lawful and hard-working life with an emphasis on helping others through his work. These letters outline Mr. Mincey's importance to his family and community.

Mr. Mincey's friends speak of the dependability and generosity of his character. A close friend both professionally and personally states that Mr. Mincey is widely respected throughout the community and people always found him to be someone who treated all individuals with kindness and respect. He also notes: "For me personally, I was always impressed with Chuck's unparalleled work ethic and had the highest regards for his loyalty to his profession. As I reflect on my relationships and friendships over the past years, I can attest that Chuck definitely had a positive impact on my life [and] was a consummate businessman and gentleman." *Exhibit L*, Letter from Howard Sherman. Another friend speaks to Mr. Mincey's "high business character" and "high moral character on a personal level" and writes:

> I have seen Mr. Mincey perform to the letter of agreements even in cases that were not advantageous to him. Mr. Mincey does what he says he is going to do when he says he is going to do it and does it to the best of his ability in all circumstances…Making an honest living, doing for others and making decisions with thought and concern for others are all things that Chuck has taught me through his actions, not just his words.

*Exhibit M,* Letter from Scott Pratt, Grant Management Officer for the Small Business Administration. Similarly, a friend of over 30 years describes Mr. Mincey as "completely

8

trustworthy, generous…In short, there is no one I would trust more completely or thoroughly than Chuck Mincey." *Exhibit N,* Letter from Thomas R. Goldstein. Finally, a lifelong friend describes Mr. Mincey's life as a husband and father, and states that he is "exceptional at these responsibilities of family, now he is expanding these attributes on to his grandsons." *Exhibit O*, Letter from Harry P. Butch Shaw, IV.

Mr. Mincey's business associates in the construction industry also describe his character and trustworthiness. One colleague describes him as follows:

> I have known and worked with Chuck Mincey for over seven years. I have always found him to be honest and forthright with a healthy dose of common sense. He is willing to go the extra mile to produce a desired outcome and has been willing to sacrifice personally to ensure that my clients are treated fairly.

*Exhibit P*, Letter from Joe Easley, Construction Manager for Operation Home. Greg Jones, the Coordinator for East Cooper Faith Network explains that he has worked with Mr. Mincey on about six projects and at all times, he found Chuck to be "highly reliable, consistent and fair" and notes "Chuck recognizes the value of relationships and treating all people with kindness. He and his company have made a positive impact in our community." *Exhibit Q,* Letter from Greg Jones of East Cooper Faith Network.

Mr. Mincey has been the owner/operator of Palmettos at Folly since 1999, and since 2009, he has taken great pride in servicing nonprofit organizations and low-income families through his work as a licensed general contractor and would like to continue his work in the future if the Court allows. Though some of the reference letters noted below date back several years, the numerous letters from non-profit organizations servicing low-income families testify to the strength of Mr. Mincey's character and outline the positive impact he has had on countless families in the region. By way of example, an August 17, 2018 letter from FEBP/Freedom Empowerment Building Programs notes "Our Nonprofit organization company has worked with Palmettos at Folly, LLC

9

on numerous jobs since January 2013…Palmettos at Folly, LLC has always performed excellent work and met all of its obligations" and is "honest and capable." *Exhibit R,* Letter from John W. Johnson, Jr. of FEBP/Freedom Empowerment Building Programs.[7]   Mr. Mincey was also recognized by "Create Jobs for USA" for his work with BCD Affordable Housing, LLC to rehabilitate a six-unit apartment complex in downtown Charleston, which provided affordable rental housing for low-and moderate-income families. *Exhibit V*, "Create Jobs for USA-Success Stories".

Even more telling is the numerous references Mr. Mincey has personally received from homeowners thanking him for his company's work on their homes through the FHLBA program. The more than 30 testimonials attached hereto portray a reliable, solid contractor who provides quality work, as well as someone who is compassionate, knows how to treat people, and follows through even after the job is done.[8]  By way of example, one homeowner stated "I will welcome him for work of any kind.  He and his team are [commended] for a job well done.  Mr. Mincey and his team respect their work and surroundings…I highly recommend Mr. Mincey and his team for repairs to everyone I know!"  *Exhibit W,* Reference from Crystal Wright.  Similarly, another homeowner expressed her gratitude for Mr. Mincey and his services:

> I would like to take the opportunity to express my sincere gratitude and appreciation for your support. It was so amazing to meet you at a time when I really needed help…. During our initial meeting, I could tell that you both had a heart for people.

---

[7] Similarly, Low Country Community Services, Incorporated noted that as of November 20, 2013, Palmetto at Folly had assisted Low Country Community Services, Incorporated by performing to completion more than 250 repair and renovation projects within the state of South Carolina. *Exhibit S,* Letter from Barbara Taylor of Low Country Community Services, Incorporated.  Helping Hands Int. Outreach Ministries also noted Mr.  Mincey's "integrity, reliability, punctuality, both as a contractor and individually" (*see Exhibit T*, Letter from Michael W. Markey, Sr. of Helping Hands Int. Outreach Ministries), and Charleston Area Community Development Corporation notes that Palmetto at Folly's "reputation for excellent and outstanding work continues to make [them] a leader in construction in our community and the 'go to' company for new builds, home rehabilitations and other building projects both large and small."   *Exhibit U*, Letter from Tomova Attles-Robinson of Charleston Area Community Development Corporation.

[8] *See Exhibit W* for a compilation of references from homeowners regarding Mr. Mincey's work.

10

> You took your time to explain everything to me along with my daughters. The Air Conditioning Unit was a blessing to me and my family and is still in perfect condition. I finally had the knee surgery and it was certainly helpful to have a handrail go hold on to while going up and down the stairs. I am Thankful for the Program, and I'm glad that you were the person to help guide me through the process….

*Exhibit W,* Reference from Anna Dais.  Likewise, another homeowner stated the following: "Like myself and so many others greatly appreciate the help we were given in our time of need Mr Mincey was so helpful . He made sure the contractors did exactly what they were supposed to and in a timely manner.  I received a new HVAC when I needed it most."  *Exhibit W*, Reference from Johnny Buncumb.  Finally, a veteran widow thanked Mr. Mincey for his help:

> Without this program I would not have been able to get a new roof on my house or fix the plumbing problem…Veterans and families seem to put on the back burner sometimes, we need to lift them up for all that they have done.  Charles was always available to answer any questions I had during and after the job.  Great program, thanks for hard work and being there when need.

*Exhibit W*, Reference from Roberta Spooner.  The attached compilation of references includes many similar notes of gratitude towards Mr. Mincey for his work, time, and compassion.

These letters show that Mr. Mincey's history and characteristics weigh strongly in favor of a variance sentence that allows him to continue serving as an integral member of his family and community as soon as possible.

### C. **A variance sentence will adequately reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.**

The factors in Section 3553(a)(2)(A)-(D) address several traditional sentencing considerations.  In this case, there is no need to protect the public from further criminal conduct of Mr. Mincey because he has long been a law-abiding and upstanding citizen with the exception of this offense and, as the PSR indicates, he has demonstrated acceptance of responsibility.  Further, his family members, business colleagues, and friends have stressed that Mr. Mincey has their full

11

support in rectifying this situation and moving forward. In short, a variance sentence is adequate to serve these goals of sentencing.

### D. **Alternatives to imprisonment are available and appropriate here.**

The third factor in Section 3553(a)—the kinds of sentences available—encourages the Court to consider the various sentencing options available to it. With a variance, the Court may craft a reasonable sentence including supervised release, community service, or home or community confinement as the Court deems appropriate based on the circumstances and mitigating factors described herein. A sentence of a Supervised Release would allow Mr. Mincey to pay his restitution through gainful employment and to continue to support himself and his family members. A sentence of Supervised Release would also allow Mr. Mincey to address his own ongoing health issues, as well as assist his visually impaired wife and severely immobile mother-in-law, with whom he is very close, by providing emotional and practical support in their own endeavors and hardships.

### E. **The Advisory Guidelines as calculated in the PSR overstate the seriousness of the offense and a variance is appropriate.**

The fourth factor in Section 3553(a) requires the Court to consider the Guidelines. In this case, the Guidelines, as set forth in the PSR, provide a punishment of a sentence of 18 months to 24 months of imprisonment, along with a fine range from seven thousand five hundred ($7,500.00) to seventy-five thousand ($75,000.00) dollars, a range of one to three years of supervised release and a $100.00 special assessment. *See* PSR § D.76-78; 87-89. However, as explained above, the Court may not presume the advisory Guideline range to be reasonable, but rather must make an individualized assessment based on the facts of the case. Gall, 552 U.S. at 49-50. As explained

above, the Advisory Guidelines fail to recognize the true nature of Mr. Mincey's offense, or the mitigating factors discussed herein.

The following information is submitted as an explanation and is certainly not in any way intended to be a justification. While the Defendant accepts full responsibility for his actions, he did not enter the construction or contracting industry intending to engage in illegal conduct or defraud anyone, nor did he set the pricing associated with the home repair work he has done. Regarding the matters at issue, the FHLBA established the pricing for the work to be performed, and also approved the work completed. Further, per the independent Inspector Catalyst Builders June 19, 2017 Inspection Report regarding pricing:

> As an added note, when you factor in profit margin, particularly for jobs this small, it appears to be below current market. This is not a job we would even bid on. Labor is extremely tight in the Charleston Market and home sales are robust. Home prices and construction costs are extremely high, therefore general contractors are paying increased labor costs and requiring higher margins for this type work.

In addition, the Defendant never submitted any FHLBA Funding Certifications as it is our understanding that the Fiscal Intermediary, Mr. Zerbst, submitted all certifications to the bank. Mr. Zerbst was Mr. Mincey's former banker. Regrettably, Mr. Mincey relied on Mr. Zerbst's 26+ years in banking to serve as the Fiscal Intermediary and for compliance with the FHLBA program. The Defendant did sign Contractor Certifications on occasion which were always accurate and truthful.

While Mr. Mincey takes full responsibility for his actions, he has requested documentation of the alleged $306,219.99 loss amount as stated in the PSR; however, the Government has not provided said documentation to date. Although Mr. Mincey acknowledges that his involvement in an improper confidential agreement to share half of his profits with Mr. Zerbst was a conflict of interest, his excellent work ethic and cost-conscious approach in performing his work resulted in

13

many construction projects completed at the highest professional standards. As detailed in numerous letters of reference, Mr. Mincey took pride in helping countless low-income families with home repairs for many years. Should restitution be required, the Defendant agrees with the U.S.P.O. that he should receive credit for any restitution paid by Mr. Zerbst, which totals $246,689.99.

    **F. A variance sentence would avoid sentencing disparity among similarly situated defendants.**

Here, Mr. Mincey is respectfully asking the Court to consider the factors discussed and impose a variance sentence that allows him to once again become gainfully employed, pay his restitution should any be required, and take care of himself and assist his family members. A brief review of similar cases reveals several matters in which defendants pled guilty to a violation of 18 U.S.C. § 371 and were found to have made false statements in order to receive FHLBA AHP grants, and those defendants were sentenced to terms of probation and payment of restitution. *See, e.g., U.S. v. Bradshaw, Sr.,* Case No. 8:16-366 (Doc. 54) (D.S.C. Dec. 14, 2017); *U.S. v. Cabral-Rice,* Case No. 8:16-366 (Doc. 64) (D.S.C. Mar. 28, 2018); *U.S. v. Williams*, Case No. 3:15cr17TSL-FKB-002 (Doc. 72) (S.D. Miss. July 18, 2017). Such a result would be consistent with Section 3553(a) and would not result in any sentencing disparity among similarly situated defendants.

**IV. CONCLUSION**

For all of the foregoing reasons, Mr. Mincey respectfully requests that the Court sentence him to a term of Supervised Release or a combination of Home Confinement and any additional conditions the Court deems appropriate in this case.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

By: *s/E. Bart Daniel*
E. Bart Daniel
Federal Bar No. 403
E-Mail: bart.daniel@nelsonmullins.com
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
151 Meeting Street / Sixth Floor
Post Office Box 1806 (29402-1806)
Charleston, SC  29401-2239
(843) 853-5200

*Counsel for Defendant Charles Willys Mincey, Jr.*

Charleston, South Carolina

April 22, 2022